**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| NICHOLAS P. EHNOT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-1084 |
| | § | |
| LABARGE COATING, LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

In this suit, Nicholas P. Ehnot alleges that his former employer, Labarge Coating, LLC,

("Labarge"), breached his employment contract by failing to pay him certain commissions and

breached his retention agreement by failing to pay a bonus.[1]  (Docket Entry No. 19, First Amended

Complaint ("FAC"), at ¶ 8).  In a Memorandum and Opinion dated April 18, 2013, this court

precluded Ehnot from relitigating the breach of contract claims he had already submitted to the

Texas Workforce Commission.  *See Ehnot v. Labarge Coating, LLC*, No. H-12-1084, 2013 WL

1701068 (S.D. Tex. Apr. 18, 2013).  The remaining claims were that Labarge owed Ehnot

commissions for certain sales that predated February 10, 2011 and the retention bonus.  *Id.* at *7.

Labarge has moved for summary judgment on these claims, Ehnot has responded, and Labarge has

replied.  (Docket Entry No. 40, 41, 42).  Based on the pleadings; the motion, response, and reply;

the parties' submissions; and the applicable law, the court grants summary judgment in part and

denies it in part.  Specifically, the court concludes, as a matter of law, that Labarge does not owe

---

[1] Ehnot also alleged that Labarge Coating discriminated against him because of his age.  (FAC ¶¶
12-18).  Ehnot and Labarge filed a stipulation for partial dismissal on that claim, which the court granted.
(Docket Entry No. 39).

Ehnot a retention bonus, commissions for sales of services other than those invoiced as new-coating services, commissions on invoices properly billed to McJunkin-St. Louis, or commissions on his supervisor's new-coating sales.  Summary judgment is denied as to narrow aspects of Ehnot's commission claims that cannot be decided on the basis of the present record.

A status and scheduling conference is set for **September 30, 2013**, at 9:30 a.m. in Courtroom 11-B.  The reasons for the court's rulings are explained below.

## I.    Background

Labarge provides an epoxy-coating service for large pipes — typically forty feet in diameter — used in underground transmission and offshore pipelines.  (Docket Entry 40, Ex. A 9 (Ehnot Deposition), at 3–4).  Labarge salespeople solicit new business for the company.  Once a potential customer is identified, the salesperson makes a proposal for the desired pipe-coating services.  (Docket Entry 41, Ex. C (Ehnot Affidavit), ¶¶ 5–6).  To accept the proposal and place an order, the customer generates its own purchase order and returns it to Labarge, sometimes to the salesperson who opened the account and sometimes to Labarge's home office.  (*Id.* at ¶ 7).  After completing its work, Labarge delivers the newly coated pipes to the customer's location, and Labarge's accounting department generates an invoice and bills the customer.  Payment is generally due within 30 days.  (*Id.* at ¶¶ 9–10).  Once the invoice is paid, Labarge pays a commission to the salesperson.  The commission is paid at the end of the month in which Labarge received payment.  (*Id.* at ¶¶ 11–12).  A Labarge salesperson receives three checks a month: biweekly salary checks on the 1st and 15th day of the month and a commission check at the end of the month.  (Docket Entry 40, Ex. A, at 9).

Labarge hired Ehnot in April 2005 as a salesperson.  (Docket Entry No. 41, Ex. C, at ¶ 2).  Ehnot was the only Labarge salesperson at that time.  (Docket Entry 40, Ex. A., at 8).  Labarge entered into an employment contract with Ehnot to pay him a $65,000 base salary in addition to a commission of "4 % of Invoiced New Coating Services" to be paid "the month following receipt of payment."  (FAC, Ex. A).  During Ehnot's work at Labarge, the parties agreed on several occasions "to adjust the percentage of the commissions."  (FAC ¶ 5).  In 2007, Ehnot's commission rate dropped from 4 % to 1 %, then increased to 2 % in the "latter part of 2007."  (Docket Entry 40, Ex. A, at 6–7).  Ehnot worked under the 2 % commission rate the rest of his time at Labarge.  (*Id.*)

On March 17, 2011, Labarge fired Ehnot.  The stated reason was his poor sales performance.  This lawsuit followed.  The issues addressed in this Memorandum and Opinion are the breach of employment contract claims that remain after the prior summary judgment ruling.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ."  Fed. R. Civ. Proc. 56(c)(1)(A).  "[T]he plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex*, 477 U.S. at 322–25). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56 burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## B.      Breach of Contract and Contract Interpretation

"The elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach."  *In re Staley*, 320 S.W.3d 490, 499 (Tex. App. —Dallas 2010, no pet.).  The elements of a valid and binding written or oral contract are "1) an offer, 2) acceptance in strict compliance with the terms of the offer, 3) a meeting of the minds, 4) each party's consent to the terms, and 5) execution and delivery of the contract with the intent that it be mutual and binding."  *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied).  "It is well settled that an acceptance must not change or qualify the terms of the offer.  If it does, the offer is rejected."  *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968) (citation omitted).

"Whether a party has breached a contract is a question of law for the court, not a question of fact for the jury."  *Meek v. Bishop Peterson & Sharp P.C.*, 919 S.W.2d 805, 808 (Tex. App. —Houston [14th Dist.] 1996, writ denied).  "The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury."  *Id.*  "While the factual determination of what actions were taken is for the fact finder, whether those actions constitute a breach of contract is a question of law for the court."  *In re Cano Petrol.*, 277 S.W.3d 470, 473 (Tex. App.—Amarillo 2009, orig. proceeding).  The statute of limitations for breach of contract claims is four years.  *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 203 (Tex 2011).

"When a contract is not ambiguous, the construction of the written instrument is a question of law for the court." *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999).  "Whether a contract is ambiguous is [also] a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Nat'l Union Fire Ins. Co v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted).  "An ambiguity in a contract may be said to be 'patent' or 'latent.'"  *Id.*  "A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter."  *Id.* (citations omitted).  Ambiguity arises "only when the application of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of [two] meanings is the proper" one.  *R&P Enters. v. LaGuarta, Gavel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1989).  "If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Nat'l Union*, 907 S.W.2d at 520.  "[I]f the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex 1996).  In those cases, "summary judgment is inappropriate because the interpretation of a contract is a question of fact" for the jury.  *Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 207 (5th Cir. 1991) (citing *Toren v. Braniff, Inc.*, 893 F.2d 763, 765 (5th Cir. 1991); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987)).

A "contract is not ambiguous because it suffers from mere 'uncertainty or lack of clarity.'" *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (quoting *Madera Prod. Co. v. Atlantic Richfield Co.*, 1998 WL 292872, at *3 (N.D. Tex.

1998)).  "'The failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists.'"  *Id.* (quoting *Columbia Gas*, 940 S.W.2d at 591).  Similarly, ambiguity "does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable."  *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

To determine whether an ambiguity exists, the court looks "at the contract as a whole in light of the circumstances present when the parties entered the contract."  *Friendswood Dev. Co. v. McDade Co.*, 926 S.W.2d 280, 282 (Tex. 1996).  Though the court may evaluate the circumstances surrounding the contract's execution to understand its terms before construing it as ambiguous, the court must abstain from analyzing parol evidence to create ambiguity where one otherwise does not exist.  *See Instone*, 334 F.3d at 432.  "Parol evidence is defined as 'evidence given orally.'"  *Id.* (quoting Black's Law Dictionary 579 (7th ed. 1999)).  The Fifth Circuit has held that testimonial evidence of what an intended contract terms to mean should be excluded from an ambiguity determination.  *See Fireman's Fund*, 937 F.2d at 207 ("In construing a contract, the court must give meaning to each of its provisions, in light of the circumstances surrounding the contract's execution, excluding statements of parties as to what they intended.").  "Doing otherwise would nullify the requirement that parol evidence not be used to *create* an ambiguity, but only to *resolve* an ambiguity."  *Instone*, 334 F.3d at 432–33 (citing *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998); *Stanford Constructors, Inc. v. Chevron Chem. Co., Inc.*, 101 S.W.3d 619, 624 (Tex. Ct. App. 2003)).

III.   **Discussion**

   A.   **The Breach of Contract Claim Based on the Alleged Failure to Pay Commissions**

7

Ehnot's complaint alleged that Labarge owed him commissions but did not allege what customer accounts gave rise to the commissions, when they became due, or what amounts were due. Ehnot simply alleged that Labarge "failed to pay commissions . . . in accordance with the terms of [his employment] contract and its subsequent amendments" and that he was owed damages for the commissions Labarge "failed to pay under the employment agreement." (FAC ¶¶ 8, 10(a)).

Labarge produced documents, including correspondence, invoices, and commission statements. Ehnot retained a CPA, Ann Masel, to analyze them. (Docket Entry No. 32, at 2 ¶ 3). Masel's report identified $90,000 of unpaid commissions based on 60 customer invoices and additional unpaid commissions based on sales to the McJunkin-Redman, Welspun, Prime Pipe, Tex-Isle, and SeAH customer accounts. Labarge moved for summary judgment asserting that, as a matter of law, it did not owe Ehnot the commissions Masel identified. In his response, Ehnot explicitly abandoned his claims to commissions for sales to the Prime Pipe, Tex-Isle, and SeAH accounts. (Docket Entry No. 41 ("The Plaintiff acknowledges that the potential damages calculated on the SeAH account, the Tex-Isle account, and [the] Prime Pipe account are no longer available.")). Labarge also moved for summary judgment on commissions due before March 1, 2008 as barred by the statute of limitations. Ehnot has not responded to that argument. The court grants summary judgment on those claims.

Additionally, Ehnot limited his claim to commissions on the Welspun account to $19,699.32. Labarge represents that it has paid Ehnot this amount. There is no controverting evidence showing nonpayment. To the extent Labarge has paid the commissions on the Welspun account, the court grants summary judgment as to that claim.

Finally, in response to Labarge's summary-judgment motion, Ehnot claimed $30,000 of unpaid commissions on the Socotherm account. The remaining categories of allegedly unpaid commissions identified in Masel's report — $90,000 in commissions on 60 customer invoices and commissions due for sales on the McJunkin Redman and the Socotherm accounts — are addressed below.

### 1.    The Claim that Labarge Owes $90,103.06 Based on Customer Invoices

After reviewing invoices, Masel concluded that Labarge owes Ehnot $90,103.06 in commissions. Under prior rulings, Ehnot cannot pursue approximately $2,650.12 of that amount because it is for commissions that would have become due after February 9, 2011. Labarge argues that Ehnot cannot recover the remaining $86,452.94 of contested commissions because the underlying services were not new-coating services. Ehnot acknowledges that the underlying services for the amounts at issue were not invoiced as new-coating services. He argues that the term "coating service" is ambiguous and that "new-coating services" should include services incidental to coating. According to Ehnot, "new coating services" should include work invoiced using descriptions such as "attaching end caps, laying pipe[,] or sorting pipe." (Docket Entry No. 41, at 17). He bases the claim of $90,000 in unpaid commissions on the amounts invoiced for this added work.[2]

Ehnot's argument is unpersuasive. The employment contract he signed stated that Labarge would pay commissions on "Invoiced New Coating Services." (Docket No. 40, Ex. A). The invoices listed new-coating services separately from other services that Labarge provided. The

---

[2]  The parties also do not dispute that Ehnot was to receive "½ % on double jointing (welding) services." (Docket Entry No. 42 at 8). The invoices and Ehnot's arguments do not relate to double-jointing services because those services relate only to the Welspun account, which has been resolved through payment. (*Id.*).

9

employment-contract term, "new coating services," does not refer to or include other services that were separately listed, such as stripping off old coating off the pipes, repairing pipes, laying or sorting pipes, or shipping, handling, or storing pipes.  The contract unambiguously contemplated payment of commissions for sales that resulted in invoices to customers for new-coating services, but not separately listed sales of other services a customer might also order, even if related to applying new coatings.  Ehnot cannot recover commissions for services that he recognizes Labarge correctly invoiced as work other than new-coating services.

This does not eliminate all the commission amounts Ehnot claims relating to the invoices. In response to Masel's report, Labarge's accounting department systematically examined the invoices.  This examination identified some invoices for new-coating services Ehnot had sold, but Labarge had not paid all the commissions due.  For example, U.S. Steel Tubular Products paid Labarge approximately $19,739.40 on invoiced new-coating services.  Labarge acknowledged that it owed Ehnot a commission on this invoiced amount.  At the 2 % commission rate, Labarge would owe about $395.  Additionally, Labarge recognizes that U.S. Steel Tubular Products "short-paid" a $1,693,741.04 invoice.  Labarge did not explain how much was paid, whether that amount was invoiced as a new-coating service, or whether Ehnot received a commission on the amount that was paid.  Finally, Ehnot has demonstrated that some invoices were counted as covering only stripping work and failed to include new-coating services that were also provided. Ehnot would appear to be owed commission on his sales of these services.

Labarge generally asserts that Ehnot's course of conduct precludes him from seeking any unpaid commissions because he did not object or complain when Labarge did not pay.  Labarge, however, recognizes that a party ratifies an otherwise unauthorized act or agreement only when that

10

party has "full knowledge of the facts" and acts with the "intention of giving validity to the earlier act."  (Docket Entry No. 40 at 18 (citing *Jamail v. Thomas*, 481 S.W.2d 485, 490 (Tex. App. —Houston [1st Dist.] 1972, writ ref'd n.r.e.)).  Waiver similarly requires relinquishing a known right.  Because Ehnot only discovered these discrepancies recently, he neither ratified nor waived any underpayment.

To summarize, for the $90,103.06 in unpaid commissions identified in Masel's report, the court: (1) grants Labarge's motion for summary judgment on commissions that arose after February 9, 2011; (2) grants Labarge's motion for summary judgment on commissions for services properly invoiced as other than new-coating services; (3) denies Labarge's motion for summary judgment on commissions that Labarge acknowledges are unpaid and arose before February 10, 2011; and (4) denies Labarge's motion for summary judgment on commissions that Labarge identified as incorrectly invoiced for services other than new-coating services.

### 2.    The Claim for Commissions on Sales to the McJunkin Redman Account

Ehnot asserts that Labarge owes him $144,000 in commissions for sales made to the McJunkin Redman account.  Ehnot accuses his supervisor at Labarge, David Kersting, of "usurping" these sales to inflate his own sales record and increase his commissions at Ehnot's expense,  and to protect his job and create a justification to fire Ehnot.  (Docket Entry No. 40, Exhibit A, at 17-18).  In his deposition, Ehnot testified that while he assumed Kersting usurped some of his commissions, he did not know whether that was the case.  (*Id.*)

Kersting worked at LaBarge Pipe & Steel, Labarge's parent company, before working at Labarge.  (Docket Entry No. 40, Ex. B, at 9).  Before Ehnot's employment at Labarge, most third-party pipe-coating orders originated with LaBarge Pipe.  The Labarge Pipe salespersons would offer

a coating upgrade on all the pipes that they sold.  (*Id.* at 22).  When a Labarge Pipe salesperson successfully "upsold" a pipe sale to a coated-pipe sale, that salesperson would contact Kersting at Labarge to handle the coating arrangements.  (*Id.* at 107.)  Labarge Pipe was Labarge's biggest customer.  (*Id.* at 22).  But Labarge Pipe sales did not generate commissions for Labarge salespersons.  When Labarge Pipe sent third-party pipe-coating sales to Kersting at Labarge, no commissions would be paid on this "in-house" account.  (*Id.* at 106).

In October 2008, McJunkin Redman ("McJunkin"), a Labarge client, purchased LaBarge Pipe.  (*Id.* at 106).  After the acquisition, McJunkin retained most of the Labarge Pipe salespeople, and Kersting continued his working relationships with them.  (*Id.* at 107).  When a former Labarge Pipe salesperson — now a McJunkin salesperson — "upsold" a pipe sale to a coated-pipe sale, that salesperson would continue to work through Kersting to arrange for Labarge to do the coating work. Now, however, Labarge agreed to pay Kersting a 1% commission on sales to this account, which the parties refer to as the McJunkin-St. Louis account.  Kersting testified that he was properly credited with commissions on McJunkin-St. Louis orders because they originated from the previous Labarge Pipe account that he serviced and because he was the only Labarge salesperson making the sales to the McJunkin-St. Louis account.

Ehnot argues that the McJunkin-St. Louis commissions that Labarge paid to Kersting should have been paid to him.  Ehnot argues that Labarge owes him commissions on any new-coating service Labarge sold.  Labarge, Ehnot argues, was to funnel all new-coating sales to him for commission-crediting and work-performance purposes.  Labarge denies that it has any obligation to pay Ehnot commissions on sales he did not participate in or to customers who had accounts at Labarge before Ehnot began working there.  Labarge emphasizes that the McJunkin-St. Louis

12

account was the successor to the Labarge Pipe account, which predated Ehnot's employment.  The parties support their arguments through excerpts from their respective depositions and declarations.[3]  The court need not consider these dueling testimonial accounts of what the parties subjectively intended the words "Invoiced New-Coating Services" in the employment contract to mean.

Ehnot's claim requires interpreting the contract as entitling him to commissions on invoiced sales for *all* new-coating-services, regardless of his role in bringing the customer account to Labarge or in making those sales.  Neither the contract nor circumstances of its execution support that interpretation.  When Labarge hired Ehnot, he was the only Labarge salesperson.  But once other salespeople were hired or other personnel assumed sales responsibilities, nothing in the employment contract or the record suggests that Ehnot would get commissions on sales that these other

---

[3] Kersting testified in his deposition that he explained to Ehnot that commissions on "Invoiced New Coating Service" meant that he would be paid commissions only for "new business, not business [Labarge] already had." (Docket Entry No. 40, Ex. B (Kersting Deposition), at 9).  According to Kersting, Ehnot would get commissions for new-coating sales to customers that Labarge did not currently service, that is, for generating new business. (*Id.* at 9–10).  To generate new business, Ehnot was expected to "make cold calls"; "contact his colleagues in the business"; or sell to customers "that just heard about Labarge." (*Id.* at 3).  According to Kersting, Ehnot was paid "commissions [only] on new customers['] invoice[s] on new coating services." (*Id.* at 11).

In his deposition, Ehnot testified that he understood that he would be paid a commission on all new-coating sales that he brought to the company himself. (Docket Entry No. 40, Ex. A, at 8).  He later stated in a sworn affidavit that he "understood that after [he] was hired, all sales, except for LaBarge Pipe & Steel, would be funneled through [him] and [he] would receive a commission on all invoiced [coating] charges." (Docket Entry No. 41, Ex. C (Ehnot Affidavit), at ¶ 4).  The court notes that when the sole evidence purporting to create a genuine dispute of material fact precluding summary judgment is an affidavit that conflicts with prior deposition testimony, the Fifth Circuit has required an explanation of that conflict.  *See Copeland v. Wasserstein, Perella, & Co.*, 278 F.3d 472, 482 (5th Cir. 2002); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir.1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.").  Ehnot does not explain the inconsistency.  He asserts that he "trusted the company" and was not in the habit of checking his commission statement against his sales invoices to confirm that Labarge was paying him the correct commission amount. (See *id.* at 5).  From 2008 until he was fired in 2011, Ehnot never complained that his commission statement was incorrect. (Docket Entry 40, Ex. A., at 13; Docket Entry 41, Ex. A, at 6).

salespersons made, particularly on accounts that Ehnot was not involved in bringing to the firm.[4] Labarge's decision to assign the McJunkin-St. Louis account to Kersting based on the relationships he had previously established with McJunkin-St. Louis's salespeople and to give him a 1% commission on those sales did not breach Ehnot's employment contract.   Labarge is entitled to summary judgment dismissing Ehnot's claims to McJunkin-St. Louis sales.[5]

Perhaps anticipating this resolution, Ehnot points to discrepancies in certain McJunkin-St. Louis invoices and argues that Labarge incorrectly billed some of his McJunkin sales to the McJunkin-St. Louis account.   Ehnot submitted invoices that "appear to be [a] McJunkin-St. Louis order," but the underlying purchase order indicated a McJunkin buyer with whom Ehnot had previously worked on other McJunkin accounts.   Labarge does not explain these discrepancies.   As discussed, Ehnot cannot be said to have ratified or waived these discrepancies or alleged

---

[4] Ehnot provides no record citation for the proposition that all new new-coating sales were to be "funneled" to him.   The court's own review of the record suggests that the assertion stems from the following at Kersting's deposition:

> Q:      [I]f a potential coating customer called in after [Ehnot] was hired,
>           would that call have been funneled to [him]?
> A:      Coating only?
> Q:      Coating only.
> A:      Yes.

(Docket Entry 41-7 at 2).   That exchange, however, does not support Ehnot's position that Labarge owed him commissions on all new-coating sales for all accounts.   Placed in context, Kersting was clarifying that, as Labarge's then only salesperson, Ehnot would receive commissions for new accounts.   That, however, does not suggest that after Ehnot was no longer the only salesperson, he was still entitled to commissions for all sales on all accounts, including sales that he had no involvement in making.   Ehnot's contract terms do not preclude Labarge from assigning accounts and paying commissions for invoiced orders for new-coating services to other salespersons.

[5] Though party testimony about subjective intention is not a valid basis for contract interpretation, the court notes that Ehnot testified that when he was hired and was the only salesperson at the time, he understood that he would be paid based on "all coating sales brought to the company [by himself], since [he] was the only salesman."   (Docket Entry No. 40, Ex. A, at 8).   Kersting testified that he believed that Ehnot's commissions were for what Ehnot sold, not for sales made by others.   (*Id.* 9–10).

underpayments. *See Jamail*, 481 S.W.2d at 490. The court denies Labarge's motion for summary judgment on invoices for McJunkin purchases made through Ehnot that may have been erroneously billed on McJunkin-St. Louis's account.

Accordingly, the court grants Labarge's motion for summary judgment dismissing the claim for commissions for all sales invoiced to the McJunkin St-Louis account that do not have an underlying purchase order indicating another McJunkin buyer. The motion for summary judgment is denied as to sales that do have such an underlying purchase order.

### 3. The Claim for Commissions on the Socotherm Account

Kersting collected commissions on orders invoiced to the Socotherm account from January 2009 through March 2011. Ehnot did not bring in or service the orders and he was not the salesperson who made or closed the sales. Nevertheless, he claims he is owed $30,000 in commissions for these sales. This claim is based on the argument, addressed above, that his employment contract required Labarge to forward and credit all potential new-coating sales to him and that Kersting "usurped" the orders and the commissions. Again, implicit in this argument is that the words "invoiced" and "new" in "invoiced new coating sales" are ambiguous. As explained, there is no basis to find ambiguity. The contract is not reasonably susceptible to the interpretation Ehnot asserts, that he was entitled to commissions on all invoiced sales of new-coating services, whether he had any involvement in bringing the sales or the customer to the company. *See R&P Enters.*, 596 S.W.2d at 519. Ehnot also stated that he never earned a commission for someone else's sale and, during the course of his employment, he never asserted that Labarge owed him commission on sales in which he was not involved. (Docket Entry No. 40, Ex. A, 18–20).

The requirement that Labarge pay Ehnot commissions on "invoiced new coating sales" is not a requirement that Labarge forward all sales to Ehnot. Nor does it prohibit other Labarge personnel from selling coating new-coating services or collecting commission on those sales. The fact that Kersting received commission credit for the Socotherm account sales did not breach Ehnot's employment contract, and the employment contract does not entitle him to commissions on those sales. The court grants summary judgment to Labarge on Ehnot's claim for commissions on the Socotherm account.

### B.      The Breach of Contract Claim Based on the Retention Agreement

Ehnot argues that Labarge owes him $25,000 because he fulfilled the terms of the parties' retention agreement. But the evidence shows that Ehnot did not sign the agreement. Instead, after it was presented to him, he sent an letter suggesting changes to the terms. Such a response is not an acceptance giving rise to a contract.

On December 6, 2006, Labarge's president presented Ehnot with a retention agreement. That agreement stated that "[i]f [Ehnot] continue[d] to be employed by [Labarge] from the date hereof through and including December 15, 2009, [Ehnot] will be paid a bonus of $25,000." (*Id.*, Ex. A-3). Labarge did not offer this to all of its employees, only to key salespersons. (*Id.*, Ex. D, at 3). The agreement contained a signature block with a line for the employee and a line for Labarge's president to sign. Labarge would pay the bonus to salespersons who had signed the agreement at the end of their three-year commitment. (*Id.* at 4).

Labarge's president, Pierre L. LaBarge, III, signed the agreement and presented it to Ehnot. Ehnot testified that he believed he signed it but he is "not certain about that." (*Id.*, Ex. A, at 15). Ehnot's signature line is blank.

16

Ehnot also testified that after conferring with his attorney about the proposed retention agreement, he sent the following letter to Labarge:

> **Re:    3-year Employment Agreement / Nondisclosure and Non-Compete Agreement.**
>
> Dear Mr. LaBarge,
>
> Being in receipt of the documents that were presented to me on December 6th, 2006 at your offices in St. Louis I would like to thank you for the opportunity of becoming a long term and trusted employee of your organization.
>
> Upon the advice of my attorney it was strongly suggested that I lock in the Terms for this suggested 3-year employment period. . . .
>
> . . . .
>
> It was also brought to my attention that the enforceability of the "Nondisclosure and Non-Compete Agreement" should be based on Compensation being paid to the Employee should he be restricted from working in his chosen industry for the two-year period as stipulated in Sections 2 and 3 of the Agreement.
>
> I look forward to working out the details of the noted Agreements and until the[n] I remain,
>
> Sincerely
>
> Nicholas P. Ehnot

(*Id.*, Ex. A-5).  Labarge did not respond to this letter.  Ehnot testified that he "was so busy making enough money, [he] overlooked and forgot about the document."  (*Id.*, Ex. A, at 16).  Between December 15, 2009, the date the purported retention bonus matured, and his March 2011 termination, Ehnot never asked about the bonus or demanded payment.

"When reviewing written negotiations, the question of whether an offer was accepted and a contract was formed is primarily a question of law for the court to decide."  *Scaife v. Associated*

*Air Ctr., Inc.*, 100 F.3d 406, 410 (5th Cir. 1996).  "If an agreement has been reduced to writing, as it [is] in this case, an assent to the writing must be manifested."  *Id.*  "A party's signature on a contract is 'strong evidence' that the party unconditionally assented to its terms."  *In re Citgo Petroleum* Corp., 248 S.W.3d 769, 774 (Tex. App. —Beaumont 2008) (quoting *In re Dec. Nine Co., Ltd.*, 225 S.W.3d 693, 699 (Tex. App. —El Paso 2006, orig. proc.)).  "[B]lank signature lines are not proof, by themselves, that the parties required formal signatures for a contract to be binding."  *Tricon Energy Ltd. v. Vinmar Intern., Ltd.*, 718 F.3d 448, 454 (5th Cir. 2013).  "When a party's signature is not present, other evidence may be relied on to prove the party's unconditional assent."  *Id.*  "If one party signs a contract, the other party's acceptance may be demonstrated by its conduct, thus making it a binding agreement on both parties."  *Id.* (quotation omitted).  "The issue of whether the parties required that the agreement be signed to be considered binding is one of intent, and, therefore, the issue is normally a fact question for the jury to decide."  *Id.* (quotation omitted).  But when the contract is reduced to writing, "the question of whether an offer was accepted . . . is primarily a question of law for the court to decide."  *Scaife*, 100 F.3d at 410.

The signature lines on the proposed retention agreement are evidence that assent through signature was contemplated.  Ehnot's failure to sign is evidence that he did not assent to the retention agreement.  But that does not end the inquiry.  The contract did not expressly provide that a signature was required.  The issue is whether other evidence gives rise to a fact issue that the parties accepted the proposed retention agreement.

18

Ehnot points to the fact that he stayed at Labarge for three years.[6]  The question is not whether Ehnot fulfilled the terms of the proposed agreement, however; the question is whether he accepted the offer and entered into the agreement.

In response to the offered written retention agreement, Ehnot not only did not sign, he counteroffered.  He wrote to Labarge stating that after conferring with his attorney, he wanted to "lock in" terms relating to base salary, company vehicle, company insurance, paid business expenses, vacation time, and commissions.  In his response to Labarge's summary-judgment motion, Ehnot argued that the letter was directed at his original April 2005 employment agreement and the nondisclosure/noncompete agreement and was not intended to affect the proposed retention agreement.  Ehnot pointed to the references to "agreements" (plural) in the letter.  The record does not support this argument.  Neither the noncompete agreement nor the 2005 employment agreement refers to a three-year employment period.  The letter's subject line refers to a "3-year Employment Agreement" as well as the "Nondisclosure and Non-Compete Agreement."  By stating that he wanted to "lock in the terms" to the "suggested 3-year employment period" before accepting the retention agreement and indicating that he looked forward to "working out the details of the noted Agreements," the record clearly shows that Ehnot did not agree to accept the retention agreement as offered.  "[I]t is elementary that an acceptance must not change or qualify the terms of an offer; if it does, there is no meeting of the minds between the parties because the modification then becomes a counteroffer." *Lewis v. Adams*, 979 S.W.2d 831, 834 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (citing *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex.

---

[6]  The court notes that Pierre LaBarge, III testified that other employees presented with the offer, signed the letter and that he paid all retention bonuses which employees signed.  (Document 40, Ex. D., at 4).

1998)).  Ehnot's response to the offered agreement, and his failure to sign it, lead to the conclusion that he did not assent to it.

Ehnot's attempt to construe the retention contract as a unilateral contract that he performed by staying on the job for three years also fails.  Ehnot relies on *Vanegas v. American Energy Services*, 302 S.W.3d 299 (Tex. 2009), but the case does not provide support for his argument.  In *Vanegas*, the Texas Supreme Court considered the "enforceability of an employer's alleged promise to pay five percent of the proceeds of a sale or merger of the company to employees who are still employed at the time of the sale or merger." *Id.*  The employer argued that contract was invalid as illusory because the employees were at-will and could be fired anytime, for any reason not otherwise illegal.  The Texas Supreme Court agreed that there was no obligation to retain the employees until the merger but held that the agreement was a unilateral contract that became binding on the employer once the employees performed by remaining employed until the merger took place.  In this case, by contrast, Labarge offered a bilateral contract that Ehnot rejected by counteroffering.

"A bilateral contract is one in which there are mutual promises between two parties to the contract, each party being both a promisor and a promissee." *Hutchings v. Slemons*, 174 S.W.2d 487, 489 (1943).  "A unilateral contract, on the other hand, is created by the promisor promising a benefit if the promisee performs.  The contract becomes enforceable when the promisee performs." *Vanegas*, 302 S.W.3d at 302 (quoting omitted).  The retention agreement Labarge offered Ehnot was bilateral and, in exchange for Ehnot's up-front promise to remain for three years, Labarge promised to pay him $25,000, even if his employment was involuntarily terminated except for specified reasons.  The proposed agreement specified that Ehnot would get the bonus unless his employment was terminated for:

20

(I) the failure . . . to perform the duties assigned to him, which failure to perform shall continue after [Ehnot] has been informed of such failure and given a reasonable opportunity . . . to cure such failure,

(ii) [Ehnot's] commission of fraud or dishonesty against [Labarge], or

(iii) conduct which impairs the reputation of, or materially harms the business interests of, the Company.

(Docket Entry No. 40, Ex. A-3). Ehnot rejected this offered bilateral contract by seeking additional and different terms relating to his employment. Ehnot cannot avoid summary judgment by recasting the nature of the contract and asserting coincidental performance. The court grants Labarge's motion for summary judgment on the claim for breach of the retention agreement.

## III.    Conclusion

For the foregoing reasons, the court grants Labarge's motion for summary judgment and dismisses with prejudice Ehnot's breach of contract claims arising from:

- commissions on the Prime Pipe, Tex-Isle, and SeAH accounts;

- commissions barred by the four-year statute of limitations;

- commissions correctly invoiced as services other than new-coating services;

- commissions properly invoiced as a sale by Kersting to McJunkin-St. Louis;

- commissions on sales properly invoiced as a sale by Kersting to Socotherm; and

- the $25,000 retention bonus.

The court denies Labarge's motion for summary judgment as to the breach of contract claims for:

- commissions for sales improperly invoiced as for services other than new-coating services; and

- commissions for sales improperly invoiced as a Kersting sale on the McJunkin-St. Louis account.

A status and scheduling conference is set for **September 30, 2013**, at 9:30 a.m. in Courtroom 11-B.

SIGNED on September 10, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge